UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward H. CHAMBERS, Defendant-Appellant.

No. 17380.

United States Court of Appeals
Sixth Circuit.

Sept. 29, 1967.

Joseph C. Healy, Covington, Ky., for appellant.

Thomas R. Smith, Asst. U. S. Atty., Cincinnati, Ohio, for appellee, Robert M. Draper, U. S. Atty., E. Winther McCroom, Asst. U. S. Atty., Cincinnati, Ohio, on brief.

Before PHILLIPS, EDWARDS and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

Defendant-Appellant, Edward H. Chambers, appeals following his conviction by a jury on five counts of an indictment in the District Court for the Southern District of Ohio. In the first count Defendant-Appellant was charged with conspiring with seven other named persons to commit an offense against the United States, to wit: To violate Section 1952, Title 18, United States Code, in violation of Section 371, Title 18, United States Code. Counts III, IV, V and VI of the indictment charged the Defendant-Appellant with the substantive offense of violating Section 1952, Title 18, United States Code, known as the Anti-Racketeering Statute. On each of these counts Appellant was alleged to have wilfully, unlawfully, and knowingly traveled or caused others to travel on various dates in interstate Commerce from Cincinnati, Ohio, to Newport or Covington, in the

State of Kentucky, with the intent to promote and carry on the unlawful business enterprise involving prostitution and with thereafter promoting, managing and carrying on such unlawful activities of keeping, operating and procuring business for a house of prostitution, which latter activities were carried on in violation of the law of the State of Kentucky. A verdict of guilty was returned by the jury and the Defendant-Appellant was subsequently sentenced to three years on each of Counts I, III, IV, V and VI, to run concurrently with each other. The first issue raised by Defendant-Appellant on appeal is whether there was sufficient evidence to support the conviction.

The Government's evidence showed that for some time prior to March 13, 1965, Vivian Schulte operated a house of prostitution in Covington, Kentucky, in partnership with Clement J. Schweinefuss, also known as Bud Schweinefuss, who was named in the indictment as a co-conspirator of Defendant-Appellant. Vivian Schulte served as a "madam" in the business enterprise. Her duties included answering the telephone, answering the door to callers, collecting the money from customers, keeping account of the money for the girls, and dividing up the income between the house and girls at the end of the day. Generally, her duties were described as seeing that everything ran smoothly and admitting customers in and out of the house.

As a part of the operations, customers were generally received through an arrangement with cab drivers operating out of the City of Cincinnati who would call the house and make arrangements to carry dates there for the purpose of prostitution. Approximately 65 to 70 percent of the business of the house was arranged through this means.

Vivian Schulte terminated her employment as the house madam on or about March 13, 1965. Approximately one week thereafter the Defendant-Appellant, Edward H. Chambers, took up employment at the same house. Witness Joyce Jackson, one of the girls who worked as a prostitute at the house, indicated that

Defendant-Appellant's duties included many of the same things as did the duties of Vivian Schulte in that he answered the door and the telephone; that she would collect money from the customers and turn it over to Defendant-Appellant, who, in turn, at the end of the day would return her share; that further, the prostitutes were told by Defendant-Appellant whether or not it was a cab date; and that he would tell them it was a cab date after he answered the telephone. Throughout the entire period of operation of the house the co-conspirator Bud Schweinefuss, according to the evidence on behalf of the Government, participated as a principal partner. Throughout this same time the co-conspirators Walter Cardano, Harman G. Parker, Marion Parker, and Limbell Halsey were employed as cab drivers operating out of the downtown Cincinnati area who, after placing telephone calls, transported customers from Cincinnati, Ohio, to Covington or Newport, Kentucky, for the purpose of participating in the unlawful prostitution activities carried on by Defendant-Appellant and others.

Evidence was presented that on or about March 18, 1965, the date mentioned in Count III of the indictment, Patrolman Pruitt of the Cincinnati Police Department was transported from Cincinnati, Ohio, to Newport, Kentucky, along with Patrolman Michael Lander, also of the Cincinnati Police Department, for the purpose of engaging in the activity of prostitution. Both patrolmen testified that they were admitted into the house by the Defendant-Appellant, Edward H. Chambers. Further, the evidence showed that on March 24, 1965, Mr. Joseph Shaw, who at the time was a patrolman in the Cincinnati Police Department and one Robert Weidinger, also a patrolman in the Cincinnati Police Department, were likewise transported from Cincinnati, Ohio, to Covington, Kentucky, for the purpose of fulfilling a prostitution date and that upon their arrival at the house of prostitution, they were admitted by Defendant-Appellant, Edward H. Chambers.

The evidence showed further that on or about March 25, 1965, Patrolman Weidinger and Mr. Shaw were again transported from Cincinnati, Ohio, to Covington, Kentucky, for the purpose of fulfilling a prostitution date. On that day they were again admitted to the same house by Defendant-Appellant, Edward H. Chambers.

Other evidence indicated overall participation on the part of Defendant-Appellant in the operation of the house of prostitution. Further, at the time of his arrest, the Defendant-Appellant attempted to dissuade persons calling by telephone from coming at the time the agents for the Federal Government were on the premises by shouting, when Officer Barry took the telephone, "Hang up, don't say anything."

The testimony of the Defendant-Appellant was that he was aware that prostitution was going on while he was working on the premises; that he was not in the employ of Bud Schweinefuss; that as a favor to Schweinefuss, he was only performing services that consisted solely of taking out the garbage, stoking the furnace and watching Schweinefuss's personal property in the house of prostitution.

■ We are of the opinion, from a review of the evidence that it was both logical and permissible for the jury to infer that Defendant-Appellant's relationship with co-conspirators Schweinefuss and the cab drivers from Cincinnati was to promote prostitution and to aid them in their interstate travel for the purpose of carrying on prostitution in the State of Kentucky. Defendant-Appellant actually was in charge of the illicit operations that were the inducement for the interstate travel. The evidence is clear that the intent of the cab drivers was to engage in an unlawful activity across a state line.

" * * * When a person engaged in an illegal business persistently disregards plain facts which are readily available to him, and there is an evident motive to ignore those facts, the law does not forbid a jury to reach the conclusion which rational men would reach in the circumstances. See United States v. Starkey, 52 F.Supp. 1, 3 (E.D.Ill.1943); United States v. Segelman, 86 F.Supp. 114, 121 (W.D. Pa.1949), Cf. Pereira v. United States, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Corey v. United States, 305 F.2d 232, 237 (9th Cir., 1962); Pilgrim v. United States, 266 F.2d 486, (5th Cir., 1959); Brubaker v. United States, 183 F.2d 894, 989 (6th Cir., 1959)." United States v. Zambito, 315 F.2d 266, 268 (4th Cir., 1963).

■ Circumstantial evidence is sufficient to sustain a conspiracy conviction. It need not be inconsistent with any conclusion save that of guilt, provided it establishes a case from which a jury can find defendant guilty beyond a reasonable doubt.

■ A person may be guilty of a conspiracy even though he has limited knowledge as to the scope of the conspiracy and no knowledge of details of the plan or operation in furtherance thereof or of the membership in the conspiracy or of the part played by each member and the division of the spoils. However, to sustain a conviction, the defendant must know the purpose of the conspiracy. United States v. Natale, D.C., 250 F.Supp. 381.

■ Proof of the requisite knowledge and intent on the part of conspirators need not be made by direct evidence. Indeed, it is a rare case in which such evidence may be found. The conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from facts. United States v. Zuideveld, 316 F.2d 873, 878, (C.A.7, 1963).

■ This Court has previously held that once the existence of a conspiracy is established, slight evidence may be sufficient to connect a defendant with it. Poliafico v. United States, 6 Cir., 237 F.2d 97; United States v. Gosser, 6 Cir., 339 F.2d 102.

■ Defendant-Appellant further contends there was no evidence whatsoever

that he traveled in interstate commerce. It is not a necessary element for conviction to show that a person physically traveled in interstate commerce. Where the substantive offense is committed by one or more conspirators in furtherance of an unlawful activity, all members of the conspiracy are guilty of the substantive offense. See Bass v. United States, 8 Cir., 324 F.2d 168; United States v. Zizzo, 7 Cir., 338 F.2d 577.

█ In addition, there is evidence to show that Defendant-Appellant would answer the telephone, which, coupled with the statements of the cab drivers who were making the arrangements that they used the telephone to make their initial contact prior to transporting persons across the State line for the purpose of engaging in the activity of prostitution, is sufficient to bring Defendant-Appellant within the provisions of Section 1952, Title 18 United States Code.

Defendant-Appellant also maintains that he was illegally arrested and that certain evidence was obtained by an illegal search and seizure. The evidence objected to was obtained when FBI agents, operating under a warrant for the arrest of Bud Schweinefuss and Vivian Schulte, proceeded to a house in Covington, Kentucky, where the two suspects had been known to engage in illegal prostitution operations. After the agents knocked on the door and announced their authority and their purpose, a person (later identified as the Defendant-Appellant) came to the door and pulled back the shade. That person then drew back and retreated from the door, apparently refusing to admit the officers. After a brief interval of time, the agents broke down the door and entered the house. Upon entering the house they found the Defendant-Appellant standing in the kitchen. He was informed that he was under arrest and was advised of his constitutional rights,

and he was searched for weapons. In his right front trouser pocket and in his left shirt pocket were found some "calling" cards.[1] During this search the Defendant-Appellant had been resisting the placing of handcuffs on him and had been making movements toward a cabinet in the kitchen. That cabinet was searched, and in a drawer was found a pistol. Both items were introduced into evidence against the Defendant-Appellant.

█ The search in this case did not go beyond the bounds of reasonableness. The permissible scope of a warrantless search incident to a lawful arrest is limited, but it cannot be doubted that the limits extend at least to the person of the arrested suspect. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). And under appropriate circumstances, the search may extend beyond the person of the one arrested to the premises under his immediate control. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). In its most recent case concerning the scope of a search as incident to a lawful arrest, the United States Supreme Court stated:

"The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967).

█ The searches in this case were not general exploratory searches as in Go-Bart Importing Company v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); nor were they too remote in place as in Agnello v. United

1. The "calling" cards were used to identify previous customers. A fictitious name was placed on the card and a number indicating the amount of money spent by the customer. On the back of the card was the telephone number of the establishment so that the customer could call and come back on his own without resorting to a cab driver.

States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), or in time as in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Here Chambers' person was searched to insure that he did not have a weapon by which he might resist arrest or make an escape. Although the pistol[2] seized from the cabinet drawer was not in sight as were the ledges seized in Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), the cabinet was not searched until Chambers resisted the placing of handcuffs on him and made evident motions toward the cabinet. Under these circumstances, the search of the cabinet, which was under the immediate control of Chambers, was justified, at least for the limited purpose of discovering weapons or other means of effecting an escape.

Regardless of the reasonableness of the scope of the search, the lawfulness of the search depends in the first instance on the legality of Chambers' arrest; and the legality of the arrest in turn depends upon the validity of the entry made by the FBI agents. The FBI agents were proceeding under a warrant[3] for the arrest of persons whom they reasonably believed to be in the premises entered. This Court has previously indicated that since Rule 4(c) (3) of the Federal Rules of Criminal Procedure sets forth certain regulations regarding the execution of an arrest warrant but does not cover the procedure for making a forcible entry to execute such a warrant, state law controls on this point. United States v. Alexander, 346 F.2d 561 (C.A.6, 1965). Cf. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Section 70.180(5) of the Kentucky Revised Statutes grants authority to an officer who is executing an arrest warrant to " * * * break open any door of the dwelling or other house of the defendant, or any other person, if it is necessary to enable him to make the arrest." This section has been interpreted as not requiring a demand for entrance or explanation of purpose by the arresting officer. Strader v. Commonwealth, 302 Ky. 330, 194 S.W.2d 368 (1946). Such a procedure has been approved by the United States Supreme Court under certain exigent circumstances, although the Court indicated that evidence seized upon an entry without notice might be excluded from the federal courts under the supervisory power doctrine. Ker v.

2. It appears from the record that the Defendant did not object to the admission of the pistol into evidence at the trial and so waived his right to object in this Court. In view of the circumstances of the search, however, it is unnecessary to base the decision on the Defendant's waiver.

3. Although it is not clear whether the agents had the arrest warrants in hand at the time of entry, a determination of this point would not change the decision in this case. In United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), the Supreme Court implied that, in the absence of an applicable federal statute, state law would control an arrest even if under a warrant issued by a federal magistrate. Here Rule 4(c) (3) of the Federal Rules of Criminal Procedure specifically provides that for proper execution of an arrest warrant the officer need not have the warrant in hand. It is clear that in Kentucky to arrest under a warrant for a misdemeanor, the officer must have the warrant in hand. Williams v. Commonwealth, 339 S.W.2d 937 (Ky.1960); Powell v. Commonwealth, 307 Ky. 545, 211 S.W.2d 850 (1948). It is not clear that the same rule follows for arrest on a felony charge. In any event, the knowledge that a warrant was outstanding for the arrest of Bud Schweinefuss and Vivian Schulte coupled with the information received from the Cincinnati Police undercover agents would have given the FBI agents probable cause to make an arrest without a warrant and reasonable grounds to believe that the suspects could be found in the premises entered. Since there are no cases in Kentucky and no statutory law concerning entry to make an arrest without a warrant, it can be assumed that Kentucky follows the common law rule as set out in Semayne's Case, 5 Co.Rep. 91a, 77 Eng.Rep. 194 (1603), and which is embodied in 18 U.S.C. § 3109 (1951). These requirements were followed by the agents in this case.

State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962).

■■■■ The decision of this case, however, need not rest on the basis of the state law. Here the agents not only satisfied the Kentucky requirements but also satisfied the federal requirements as set out in 18 U.S.C., § 3109 (1951).[4] Before forcing their way into the house, the agents announced their authority and the purpose of their entry and could have reasonably believed that they were denied admittance. Cf. United States v. Alexander, 346 F.2d 561 (C.A.6, 1965). Refusal of admittance is not limited to affirmative refusals. Masiello v. United States, 115 U.S.App.D.C. 57, 317 F.2d 121 (1963). The length of time that officers must wait before forcing an entry must necessarily vary with the circumstances of each case. Had this been an ordinary home, a retreat from the door might have been a more ambiguous movement. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). But here the FBI agents knew that the house was used exclusively for the purpose of prostitution operations. They had good reason to believe that the persons for whom they had arrest warrants were in the house and that the suspects might resist arrest or attempt an escape. Also the nearness of the pistol and the apparent attempt by the Defendant-Appellant to reach it show the practicality of the rule permitting a quick entry to prevent peril of bodily harm and justify the prompt action taken by the agents.

■■■■ The entry by the agents being lawful, the arrest of Chambers without a warrant was lawful if the agents had authority and probable cause to make the arrest. The FBI agents had authority to arrest without a warrant under 18 U.S.C. § 3052 (1951) if they had reasonable grounds to believe that the Defendant-Appellant had committed a felony cognizable under the laws of the United States.[5] Here the arrest was obviously not made solely for the purpose of effecting a search as in Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed. 2d 876 (1957). The presence of the Defendant-Appellant in an illegal house of prostitution together with the information concerning his prior participation in the operation of the house that the FBI agents had received from the Cincinnati Police undercover agents justified a reasonable belief that the Defendant-Appellant had committed the felonies as set out in the indictment. Hence, the arrest was valid; therefore, the reasonable search incidental to it was valid, and the "calling" cards and pistol were properly admitted into evidence.

Other issues have been raised by Defendant-Appellant which we have considered and found without merit.

Judgments are affirmed.

---

4. Although the statute by express language only applies to the execution of a search warrant, it is well settled that the requirements of the statute apply in the same manner to execution of an arrest warrant or to arrest without a wararnt. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

5. The officers had the same authority under Kentucky law. Kentucky Revised Statutes § 431.005 (1963). Cf. Darden v. Commonwealth, 298 S.W.2d 687 (Ky. 1957); Brewster v. Commonwealth, 278 S.W.2d 63 (Ky.1955). In the absence of an applicable federal statute, the law of the state where an arrest without warrant takes place determines the validity of the arrest. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948).