872 F.2d 1030
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ellis RANDOLPH, Defendant-Appellant.
 No. 85-1976.
 United States Court of Appeals, Sixth Circuit.
 April 7, 1989.
 
 Before KEITH, NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant-appellant appeals his jury conviction for conspiracy to possess stolen mail, possession of stolen mail, and fraudulent "uttering and publishing." For the reasons which follow, we affirm.
 
 I.
 
 2
 In the summer of 1982, Dorothy Hunter ("Hunter"), who was a defendant in the proceedings below, approached her long-time acquaintance, Kenneth Matsen ("Matsen"), about participating in a check cashing "business" she was operating. According to Matsen, Hunter told him that she worked at a nursing home, and that some of the residents of the home were having trouble cashing the checks they received. Hunter proposed that Matsen, who operated a small business, cash these checks on a regular basis, in exchange for a commission ranging up to five percent of the face value of each check. Matsen agreed to this arrangement.
 
 
 3
 In October of 1982, Hunter began bringing the pre-endorsed checks to Matsen for cashing. For one reason or another, Matsen initially persuaded some of his friends to cash the checks. Upon receiving the cash, Matsen kept the appropriate commissions for himself, and delivered the balance of the proceeds to Hunter. Soon after the operation began, however, the individuals who were cashing the checks for Matsen became uncomfortable about the lack of endorser identification on the checks. Matsen informed Hunter of this fact, and she began bringing driver's licenses, purportedly belonging to the endorsers, along with the checks. According to Matsen, when he received the checks from Hunter, he would compare the information on each check with the information on the accompanying driver's license, then pass the checks along to his friends for cashing.
 
 
 4
 In late 1982, Hunter introduced the defendant-appellant, Ellis Randolph ("Randolph"), to Matsen. According to Matsen, Hunter introduced Randolph under a false name and falsely told Matsen that Randolph was her brother. Soon thereafter, Hunter suffered a disabling leg injury and she was hospitalized. Randolph then began bringing the checks to Matsen. Matsen testified that when Hunter had checks to be cashed, she would call and tell him the dollar amount of the checks that Randolph would be bringing. Upon receiving the checks, Matsen would verify the information on each check with the accompanying identification, deduct the appropriate commissions, and give Randolph the balance in cash. This arrangement apparently continued for some time after Hunter left the hospital.
 
 
 5
 By May of 1983, Matsen was cashing the checks himself instead of having his friends cash them. Around that time, Matsen learned that a number of the checks which he had cashed for Hunter and Randolph were not accepted for payment because they had been reported as stolen. Matsen testified that when he attempted to contact Hunter and Randolph concerning this matter, he learned that their phone numbers had been changed. Matsen failed in his further attempts to locate Hunter and Randolph, and they never contacted him again. Ultimately, all of the checks which Matsen and his friends had cashed for Hunter and Randolph, some 150 checks totalling $70,000.00 to $80,000.00, were found to have been stolen and forged.
 
 
 6
 On February 22, 1985, a federal grand jury for the Eastern District of Michigan returned a sixteen-count indictment against Hunter and Randolph. The indictment charged Randolph with one count of conspiring to receive and possess stolen mail, in violation of 18 U.S.C. Secs. 371 and 1708 (1982); two counts of possessing stolen mail, in violation of 18 U.S.C. Sec. 1708; and two counts of fraudulent "uttering and publishing," in violation of 18 U.S.C. Sec. 495 (1982). After a two-day trial at which Matsen was the government's chief witness, Randolph was convicted on all of these charges. He was sentenced to four years imprisonment on each of the five counts, the sentences on the "possession" and "uttering" counts to run concurrently with the sentence on the conspiracy count.
 
 II.
 
 7
 On appeal, Randolph argues that there was insufficient evidence for the jury to convict him of the crimes charged in the indictment. Specifically, he contends that there was insufficient evidence from which the jury reasonably could conclude (1) that he and Hunter were operating under an illegal agreement; (2) that he knew that the checks were stolen; or (3) that he represented that the endorsements on the checks were genuine. In considering these challenges, we must view the evidence in the light most favorable to the government. United States v. Scartz, 838 F.2d 876, 878 (6th Cir.), cert. denied, 109 S.Ct. 303 (1988). Moreover, we may not disturb the jury's verdict unless a rational trier of fact could not have found, beyond a reasonable doubt, that Randolph committed the charged offenses. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 8
 Randolph argues that there was insufficient evidence from which the jury could "reasonably infer" that he and Hunter were operating under an illegal agreement, and that his conviction on the conspiracy charge must therefore be reversed. We disagree. Matsen testified at trial that Hunter introduced Randolph to him under a false name, and falsely told him [Matsen] that Randolph was her brother. Randolph apparently continued to use that false name for some five to six months. Matsen further testified that when Hunter was injured, she would call and tell him [Matsen] the dollar amount of the checks that Randolph was going to bring. Randolph always brought the checks, and Matsen cashed them as he had for Hunter. Although the evidence was not overwhelming on this point, the jury was free to conclude that Randolph and Hunter were operating under an illegal agreement. We therefore reject Randolph's sufficiency-of-the-evidence argument as it relates to the conspiracy charge.
 
 
 9
 With respect to the possession of stolen mail charges, Randolph argues that there was insufficient evidence of his knowledge that the checks were stolen. Again, we disagree. It is settled law that a defendant's possession of recently stolen property, if not satisfactorily explained, may support a jury's inference that the defendant knew that the property was stolen. Barnes v. United States, 412 U.S. 837 (1973). Moreover, "the mere fact that there is some evidence tending to explain a defendant's [innocent] possession" does not necessarily suffice to dispel this inference, as the jury is free to accept or reject the defendant's proffered explanation. Id. at 845 n. 9. In the instant case, Randolph does not dispute that he was in possession of the stolen checks, but instead attempts to portray himself as an innocent "carrier" of those checks. However, given that Randolph apparently continued to use a false name for some six months, then "disappeared" when the illegal scheme was close to being discovered, we believe that the jury had ample evidence to conclude that Randolph knew that the checks were stolen. See also United States v. Rowan, 518 F.2d 685, 691 (6th Cir.), cert. denied, 423 U.S. 949 (1979) (providing that a jury may consider a defendant's flight as evidence of his guilt).
 
 
 10
 Finally, Randolph contends that there was insufficient evidence to support his conviction on the fraudulent "uttering and publishing" charges because, as he asserts, there was no proof that he represented that the endorsements on the checks were genuine. Randolph correctly observes that, in order to sustain a conviction under 18 U.S.C. Sec. 495, the government must prove that the defendant attempted to circulate a false writing by fraudulent representation that is genuine. United States v. Jones, 648 F.2d 215, 217 (5th Cir.1981). Although the government did not introduce direct evidence that Randolph represented that the endorsements on the stolen checks were genuine, there was ample circumstantial evidence for the jury to reach this conclusion. As noted above with respect to the conspiracy and possession charges, the jury had sufficient evidence to conclude that Randolph was a full participant in Hunter's illegal scheme. Moreover, the jury was free to credit Matsen's testimony that he was unaware that the checks were stolen, or that the endorsements were forged. In light of these two permissible conclusions, we believe that there existed sufficient record evidence for the jury to find Randolph guilty of violating 18 U.S.C. Sec. 495.
 
 
 11
 For these reasons, we hereby AFFIRM the judgment of conviction.